UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 3:20-cr-809 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| CHRISTAL ENGLAND, | ) | |
| | ) | |
| DEFENDANT. | ) | |

On December 2, 2020, an indictment issued charging defendant Christal England ("England") and a second individual, defendant Dishon Longmire ("Longmire"), with conspiracy to possess with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 846, and possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). (Doc. No. 1 (Indictment).) Now before the Court is England's motion to suppress evidence seized by police on October 3, 2020. (Doc. No. 24 (Motion).) Plaintiff United States of America (the "government") opposes the motion. (Doc. No. 25 (Opposition).) The Court conducted an evidentiary hearing on the motion on October 8, 2021. At the conclusion of the hearing, the Court took the matter under advisement.

For the reasons that follow, the motion to suppress is denied.

**I.   BACKGROUND**

Detective Darian Cook ("Det. Cook") of the Sandusky Police Department ("PD") was the only witness to testify at the evidentiary hearing. Det. Cook, a narcotics detective and five year

veteran of the force, testified that Sandusky, Ohio is a smaller community with a population of approximately 30,000 people. Due to its size, officers—and, in particular, narcotics detectives such as Det. Cook—become familiar with the "frequent flyers," that is, those who regularly are involved in the area's drug trade. According to Det. Cook, one such "frequent flyer" was England.

Det. Cook testified that before his encounter with England on October 3, 2020, which resulted in England's arrest in this case, he was aware that the Sandusky PD had information linking England to drug activity. Specifically, he was aware of the following:

(1) That in December 2016, the Sandusky PD received information of narcotic activity at a known residence of England. While conducting surveillance, officers stopped an individual leaving the residence and found that he was in possession of narcotics. The individual told officers that he purchased the narcotics from England. (This incident occurred prior to the date that Det. Cook joined the Sandusky PD, but he was aware of it during his October 3, 2020 encounter with England in this case.)

(2) That sometime in 2019, a Sandusky PD officer received information that England was allegedly using food storage bags to transport and distribute narcotics.

(3) An incident in April 2019, wherein England came to the Sandusky police station to report a robbery that she claimed had taken place three days earlier on a street corner. But after police caught one of the robbers and talked to a friend of England, they determined that England had lied about the location of the robbery, which actually occurred at her residence and involved the theft of a large amount of money and narcotics from England.

(4) In May 2019, officers executed a search warrant at England's residence and discovered

drug paraphernalia and a small quantity of narcotics.

(5) In July 2019, officers attempted to arrest England in connection with outstanding warrants. England alluded police in a car and led officers on a high-speed chase before the officers broke off the chase for safety reasons. The vehicle was later discovered abandoned, but officers found narcotics and a prescription pill bottle bearing England's name in the car.

(6) In May 2020, the Drug Enforcement Administration (DEA) and the Sandusky PD were actively investigating England's co-defendant, Dishon Longmire, for suspected drug trafficking. A warrant was issued for Longmire's arrest.

(7) On May 14, 2020, Det. Cook initiated a traffic stop on a vehicle with a known narcotic abuser. At that time, Longmire, who was a passenger in the vehicle, gave a false name. Sometime after the stop, Det. Cook learned that the passenger was, in fact, Longmire and that he had outstanding arrest warrants. England's sister Ashley arrived on the scene and would not provide Longmire's identity, but she did inform Det. Cook that Longmire was England's boyfriend.

(8) Sometime after the May 14 stop, law enforcement received information that Longmire was traveling in a vehicle driven by England, and a Sandusky police officer initiated a stop of the vehicle. As the officer approached the vehicle, he observed Longmire and England make furtive movements inside the vehicle as if they were attempting to hide contraband. England had to be repeatedly told not to move. After Longmire was arrested, England was removed from the vehicle and placed in investigative detention. A search of the vehicle revealed a substantial quantity of fentanyl and heroin in a sock.

England was taken to the police station where the Sandusky PD has a body scanner that is used to locate hidden contraband on suspects. But because England informed the officers that she was pregnant, they elected not to use the scanner on her, and she was subsequently released. Thereafter, officers reviewed video footage from the night England was taken to the station that showed England making movements in the area of her lap. Officers believed that she concealed additional narcotics on her body that they would have discovered had they used the body scanner.

In addition to the foregoing, prior to October 3, 2020, Det. Cook had received information from other informants, other reliable confidential informants, and other Sandusky police officers regarding England's narcotics activity in Sandusky.

On October 3, 2020, Det. Cook, who was wearing casual clothes with a ballistic vest that displayed "police," was on routine patrol in an unmarked vehicle with a uniformed patrol officer (not his regular partner) in a high crime area known for drug activity. Det. Cook pulled his vehicle into the parking lot of the Ranchview Gardens apartment complex and observed England's van legally backed into a space.[1] He was not looking for England that evening—and had no way of knowing that she would be in the parking lot—but he recognized her immediately. He also recognized one of two men standing near England's van as a narcotics abuser named James Clem. He testified that he "put together that a known drug dealer (England) was meeting with a known user (Clem) and suspected that they were engaging in a narcotics transaction."

According to Det. Cook, England also recognized him and pointed him out to the two men

---

[1] Det. Cook was aware that England did not live in the apartment complex and that the closest of England's known residences was at least a five minute drive away.

4

she was with as he drove by in his unmarked cruiser. Det. Cook parked approximately three or four spots away and approached the driver's side of England's vehicle. His body camera recorded the encounter, and the video was played at the hearing. (Gov. Ex. A (Body Camera Recording).) While England kept her eyes trained on Det. Cook, the detective noticed that England was making furtive movements in the area of her lap. Det. Cook suspected England was attempting to conceal contraband.

Upon Det. Cook's approach, England rolled down her window, and Det. Cook falsely informed her that he had received a call regarding some suspicious activity in the area and he was checking to make sure everything was alright. England volunteered that they had just finished lunch and attempted to show the detective the empty food containers and wrappers as she began piling the refuse onto her lap. Det. Cook noticed that the uneaten food appeared to be cold and there were no fresh food odors emanating from the vehicle. She then added that they were visiting someone at the apartment complex and that they had nothing to hide.[2] As she spoke with the detective, England continued to pile wrappers onto her lap.

Det. Cook asked her if she had anything illegal in the vehicle to which she responded in the negative. England became agitated when Det. Cook suggested that the reason he posed the question was because, when he approached her vehicle, he saw her making movements toward her lap and that once she was in view he could see a bulge (visible on the video from the light of the detective's flashlight) in her lap that she kept trying to cover up with wrappers. She repeated that she was not doing anything wrong and (curiously) asked to speak with her uncle and her mother.[3]

---

[2] While Det. Cook spoke with England, his partner can be seen in the video speaking with Clem. Det. Cook testified that the second male individual left the scene shortly after the officers arrived.

[3] Det. Cooke testified that this is a ploy that is used to distract the officers.

5

She eventually started yelling at the detective and asked if she was under arrest, to which the detective calmly responded that she was not and that he was simply trying to conduct an investigation. England accused the police of harassing her, and Det. Cook reminded England that the Sandusky PD had a large case against her.

After England repeatedly failed to comply with the detective's directives to put the food wrappers away, England was instructed to put her hands on the steering wheel. These instructions came after England tried to roll up her window and, as Det. Cook testified, he believed he saw her reach for the gear shift in an effort to the leave the scene. England failed to comply with that command as well; instead, she continued to argue. When England volunteered (in a raised voice) that she did not have a gun, Det. Cook (matching her volume) advised her that he did not know what she had and repeated the instruction to put her hands on the steering wheel. Evidently frustrated with England's continued protestations and failure to comply, Det. Cook warned England that he was not "playing with her" and that he would be left with no choice but to "yank her out of the car."

Det. Cook did ultimately remove England from the vehicle, handcuff her, and advise her that she was being placed in investigative detention. When he explained to her that he did not know if she had a weapon, England responded once again that she did not. At the hearing, Det. Cook testified credibly that while his training and experience lead him to suspect that the bulge was narcotics and not a gun, his visual inspection alone was insufficient to rule out the possibility of a weapon. He explained that, from his training and experience, he was keenly aware of the "indisputable nexus between drugs and guns." Given that England had volunteered repeatedly that she did not have a gun, Det. Cook testified that standard practice dictated that he take steps to

6

confirm that she did not have a weapon.

As the detective performed a pat-down of her person, he immediately recognized a foreign object that he knew from his experience and training to be a bag of narcotics in the area where he had seen the bulge. England screamed that she did not have a gun and that she had a "f—ing kid."[4] Because the pat-down had finally dispelled any concerns that the bulge was a weapon[5], Det. Cook responded that he knew that England did not have a gun but added that she had a "big ass bag of dope" in her coat. He then revealed a cut-off sock, which contained several smaller baggies of a substance believed to be fentanyl. England was arrested on drug charges. From approach to arrest, the police encounter lasted fewer than six minutes.

## II. LAW GOVERNING WARRANTLESS POLICE ENCOUNTERS

### A. *Consensual Encounters*

Police may engage in a warrantless encounter with a citizen under three circumstances: (1) consensual encounters in which contact is initiated by a police officer without any articulable reason and the citizen is briefly asked questions: (2) a temporary involuntarily detention or *Terry* stop (based on *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)), predicated on reasonable suspicion; and (3) arrests based on probable cause. *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008). Courts have repeatedly held that, when an officer approaches a parked vehicle on foot without signs of aggression (such as displaying a weapon) in order to speak with the occupants, and does not block the vehicle's exit, the encounter is consensual. *See United*

---

[4] During the pat-down, England informed the detective that she was aware that he could "*Terry* frisk" her but added that he could do nothing more.

[5] Detective Cook testified credibly that it was only after the pat-down that he knew for sure that England was not concealing a weapon.

*States v. Carr*, 674 F.3d 570, 573 (6th Cir. 2012) ("unless there is other coercive behavior, a police officer can initiate a consensual encounter by parking his police vehicle in a manner that allows the defendant to leave"); *see, e.g., United States v. Dingess*, 411 F. App'x 853, 855–56 (6th Cir. 2011) (because officer approached vehicle on foot, without blocking the driveway, the initial approach was consensual). The test is whether "a reasonable person would feel free to terminate the encounter." *Carr*, 674 F.3d at 573 (quotation marks and citation omitted).

B. *Terry Stops*

With regard to an investigatory detention, or *Terry* stop, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Terry*, 392 U.S. at 30). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Id.* (quoting *Terry*, 392 U.S. at 2). Still, "[t]he officers need only 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Shackles*, 996 F.3d 330, 343 (6th Cir. 2021) (quoting *Kansas v. Glover*, 140 S. Ct. 1183, 1187, 206 L. Ed. 2d 412 (2020)). Moreover, that there may be a possible innocent explanation for each fact when considered separately does not defeat a finding that, together, the facts contribute to reasonable suspicion. *See United States v. Arivizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). This is true even if these facts "would arouse suspicion only in someone experienced in law enforcement matters." *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993); *see Arivizu*, 534 U.S. 273–78 (officers may rely on their experience in evaluating totality of circumstances and "need not rule out the possibility of innocent conduct"). Additionally,

it is permissible for an officer to ask a motorist to exit her vehicle pending completion of an investigatory stop. *See Maryland v. Wilson*, 519 U.S. 408, 410, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997).

### *C. Pat Downs*

In addition to authorizing an investigatory stop when there is reason to believe a crime is being committed, *Terry* permits the officer conducting such a stop to perform a limited search of the suspect to determine whether she is armed when the circumstances give rise to a reasonable belief that the individual may have a weapon and thus pose a danger to the officer or others in the immediate vicinity. 392 U.S. at 27, 30–31. The stop and the search are independent actions, and each requires its own justification. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005); *see generally Arizona v. Johnson*, 555 U.S. 323, 327, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009) ("To justify a pat down of the driver or a passenger during a stop . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.").

Of course, safety concerns are an integral component of a *Terry* stop. *Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972) ("The Court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect."); *United States v. Campbell*, 549 F.3d 365, 372 (6th Cir. 2008). The purpose of a *Terry* frisk for weapons "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable[.]" *Adams*, 407 U.S. at 146. "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." *Id*.

9

(citing *Terry*, 392 U.S. at 30).

Officers who stop a person who is "reasonably suspected of carrying drugs" are "entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions," and use reasonable measures to protect their safety. *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001). The Sixth Circuit has regularly affirmed protective pat-downs for weapons when an officer reasonably suspects drug activity. *See, e.g., United States v. Carter*, 558 F. App'x 606, 612 (6th Cir. 2014) ("officers could reasonably rely on the well-known fact that drug-trafficking often involves the use of weapons"); *United States v. Young*, 277 F. App'x 587, 589 (6th Cir. 2008) (holding that a pat-down was reasonable when officers reasonably suspected the defendant of carrying drugs); *United States v. Akinyemi*, 101 F. App'x 109, 111 (6th Cir. 2004) (similar); *United States v. Vite-Espinoza*, 342 F.3d 462, 467 (6th Cir. 2003) (similar). Additionally, furtive gestures can also support a pat-down during a *Terry* stop. *See, e.g., United States v. Thomas*, No. 1:07-cr-73-002, 2008 WL 548857, at *6–7 (S.D. Ohio Feb. 26, 2008) (relying on *Caruthers v. United States*, 458 F.3d 459 (6th Cir. 2006), and finding that furtive movements in vehicle led to belief that drug trafficking was taking place and that defendant was, therefore, armed and dangerous).

### III.   DISCUSSION

In the motion, and again at the hearing, defense counsel argued that Det. Cook did not have reasonable suspicion to approach England's vehicle on October 3, 2020, in that England was legally parked in her vehicle. But the government responded, and the Court agrees, that the police encounter on October 3, 2020 began as a consensual encounter for which no suspicion was necessary and did not ripen into a *Terry* stop until after the detective had more than sufficient

10

reasonable suspicion to support an investigative stop and pat-down.

"In a consensual encounter, 'law enforcement officers may ask citizens general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave.'" *Dingess*, 411 F. App'x at 855 (quoting *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008)). "'Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity.'" *Id.* (quoting *Davis*, 514 at 607). Factors indicating a seizure, in contrast to a consensual encounter, include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's requests might be compelled." *United States v. Gross*, 624 F.3d 309, 315 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)).

There is no evidence that either Det. Cook or his uniformed partner displayed a weapon, and it is clear from the video that neither officer raised their voices or used intimidating language when they first initiated their conversation with England and her companions. In fact, the initial exchange was pleasant and cordial. The Sixth Circuit "has analyzed similar civilian-police encounters by determining whether the police blocked the defendant's egress." *United States v. Carr*, 674 F.3d 570, 573 (6th Cir. 2012) (collecting cases). Here, there is no dispute—and the video makes clear—that Det. Cook did not block England's vehicle with his cruiser when he parked several spaces away. Under these circumstances, the officers were entitled to initiate a consensual

11

encounter without a reasonable, articulable suspicion.[6] *See United States v. Labelle*, 390 F. App'x 539, 542 n.6 (6th Cir. 2010) (characterizing encounter as consensual in part because the officer "in no way constrained defendant's movements"); *see, e.g., Dingess*, 411 F. App'x at 856 (district court properly characterized initial encounter with police as consensual because officers approached a known drug trafficker on foot after parking cruiser in a manner that did not block the suspect's vehicle).

By the time Det. Cook directed England to place her hands on the steering wheel (and ultimately removed her from the vehicle), and in addition to his other observations as he approached England's vehicle, he had observed: (1) England recognize the detective and pointed him out to her companions; (2) England continue to watch the detective while simultaneously making furtive movements near her lap; (3) England volunteer that she had just eaten lunch[7] while the refuse in the vehicle suggested that the food had not been eaten recently; (4) a lump in England's pants that the detective suspected to be narcotics; and (5) England suspiciously attempt to pile wrappers and boxes over the lump and suspiciously continue to do so after being asked to refrain. Given that England was seen at night in a high-crime area known for drug activity, in the presence of a known drug user, and she herself was known to the Sandusky PD and the detective

---

[6] Alternatively, and for the reasons discussed more fully below, the Court finds Det. Cook had reasonable suspicion to initiate a brief investigative stop before he even exited his vehicle. Det. Cook testified that based on his training and experience with narcotics transactions, he was immediately alerted to the fact that a known drug user was standing near the vehicle of a known drug trafficker in a high-crime area. "And [the detective's] presence, based on their response to [him], and the way that they stopped their activities immediately upon recognizing [him], and then the way that they watched [him] as [he] carried out [his] business led [him] to believe that they were engaged in a narcotic activity." *See, e.g., Lee v. Hefner*, 136 F. App'x 807, 811 (6th Cir. 2005) (officer patrolling high-crime area noticed that individual "turned around twice" when he approached had reasonable suspicion to briefly stop individual); *Akinyemi*, 101 F. App'x at 111 (defendant's abrupt act of placing a plastic bag in his pocket upon seeing officers exiting their vehicle in an area known for drug activity was sufficient to establish reasonable suspicion that defendant was engaging in an attempted drug transaction).

[7] This statement itself was curious because the encountered occurred at night at approximately 8:30 p.m.

as someone with a history of drug trafficking activity,[8] the totality of the circumstances afforded Det. Cook "specific and articulable facts" to justify an investigative detention. *Terry*, 392 U.S. at 21; *see, e.g., Akinyemi*, 101 F. App'x at 111 (where suspect was seen in high crime area known for drug activity placing a bag of suspected drugs in his pocket upon officer's approach, officers had a reasonable suspicion that a drug transaction had taken place); *see also United States v. Smith*, 427 F. App'x 413, 419 (6th Cir. 2011) ("Furtive movements made in response to a police presence may . . . properly contribute to an officer's suspicions.") (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 885, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975)).

England complains that the activity Det. Cook observed was individually and collectively consistent with innocent activity. She notes that she was parked legally in her vehicle, that she had eaten a meal there and had the empty wrappers to prove it, and that the officers did not witness her or the men she was talking to violate any laws. However, an innocent explanation for conduct does not foreclose the finding that Det. Cook had reasonable suspicion to justify an investigative detention. *See, e.g, Arvizu*, 534 U.S. at 277 ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct.") Det. Cook testified that based on his

---

[8] At the hearing, defense counsel argued that Det. Cook was not justified in relying on his knowledge of prior encounters with England because none of those prior events had resulted in criminal charges. (*See* Defense Ex. A (List of Criminal Actions against England).) This is not true. The events surrounding May 19, 2020 are included as a basis for the conspiracy charged in Count 1 of the indictment. (*See* Doc. No. 1 at 1.) More to the point, Det. Cook testified that, as he initiated the stop on October 3, 2020, the investigation into England was ongoing, a fact that he pointed out to England during the stop. He testified to a prior incident wherein he personally conducted surveillance of England and observed her sell a quantity of heroin to another individual who later became ill from the drugs. When asked why England was not arrested at that time, Det. Cook explained that the Sandusky PD believed that if they continued the course of their investigation, they would find England in possession of larger quantities of drugs. An officer may rely on information gleaned from an ongoing investigation in forming reasonable suspicion or probable cause. *See, e.g., United States v. McCarthy*, 77 F.3d 522, 533 (1st Cir. 1996) (officer's general knowledge of robbery investigation sufficient to justify investigatory stop).

training and experience with narcotics transactions, his observations of England and her companions, including their reaction to him as he passed by the vehicle and ultimately approached on foot, led him to believe that they were engaged in narcotics activity. *See Garza*, 10 F.3d at 1245 (objectively innocent behavior can arouse suspicion in trained officer). And when he observed England attempt to conceal a visible bulge that he believed was narcotics, as he believed she had done in past encounters with police, his suspicion was heightened.

In light of the fact that Det. Cook had reasonable suspicion to believe that a drug transaction had occurred—or was about to occur—he had the right to remove England from her vehicle and conduct a limited pat-down for weapons. *See United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (Officers who stop a person who is "reasonably suspected of carrying drugs" are "entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions[,]" and use reasonable measures to protect their safety); *United States v. Young*, 277 F. App'x 587, 589 (6th Cir. 2008) (holding that a pat-down was reasonable when officers reasonably suspected the subject of carrying drugs); *see also Wilson*, 519 U.S. at 410 (It is permissible for an officer to ask a motorist to exit her vehicle pending completion of an investigatory stop).

Yet, England underscores the fact that Det. Cook testified that he suspected that the bulge was most likely narcotics and not a weapon. Still, the detective explained that he is well aware of the "indisputable nexus between drugs and guns," and, given that England had repeatedly volunteered that she did not have a gun, he needed to rule out that possibility, something he could only do with a pat-down. It is well settled that "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be

14

warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. Det. Cook was reasonably justified in conducting a pat-down for weapons.[9]

England argues further that, even if Det. Cook had authority to conduct a *Terry* frisk for weapons, he exceeded his authority by the manner in which he conducted the frisk. In support, she cites *Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993). In *Dickerson*, the Supreme Court adopted the "plain feel" doctrine, stating as follows:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contours or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id*. at 375–76. This is precisely what happed in this case. Det. Cook testified credibly that as his hand passed over the foreign object in England's coat, "based on [his] experience and [his] training, [he] recognized it to be a foreign object that was packaged in a way that drugs are typically packaged." He immediately removed the object from England's coat pocket and showed it to England. From the video, there is no evidence that the detective "squeez[ed], slid[ or] otherwise manipulat[ed] the contents of the defendant's pocket" after he confirmed that the object was not likely a weapon. *See id*. at 378. Rather, without further exploration, he retrieved the object he had particularized reason to believe was narcotics. Det. Cook, therefore, did not "overstep[] the bounds of the 'strictly circumscribed' search for weapons allowed under *Terry*.'" *Id*. (quoting *Terry*, 392 U.S. at 26.); *see, e.g., United States v. Thomas*, No. 1:07-cr-73-002, 2008 WL 548857, at *8 (S.D.

---

[9] Given that Det. Cook was aware that England had lied in the past to police in connection with the robbery in her home, and he had reason to believe that she was lying to him regarding the reason she was in the parking lot, it was reasonable (and prudent) not take her word for it but to confirm for himself that she had no weapons.

15

Ohio Feb. 26, 2008) (no Fourth Amendment violation caused by warrantless seizure of crack where the officer immediately identified without manipulation lump in defendant's pocket as illegal narcotics and seized it).

### IV. CONCLUSION

The record establishes that Det. Cook initiated a consensual encounter with England on October 3, 2020 that did not ripen into a *Terry* investigative stop until after the detective had reasonable suspicion that she was engaged in illegal drug activity. The subsequent retrieval of the narcotics in her coat pocket was justified under the "plain feel" doctrine and was incident to a lawful *Terry* frisk.

Accordingly, and for the reasons stated, England's motion to suppress is DENIED.

**IT IS SO ORDERED**.

Dated: January 10, 2022

**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**